May it please the court, counsel, my name is Adele Bernard and I represent the plaintiff appellant Tyrone Hicks. Tyrone Hicks is an innocent man. He was wrongly convicted and completely exonerated of assaulting TT in the Bronx in 1998 in the middle of the night almost 20 years ago. Nobody disagrees about that. He didn't do it. He wasn't there. He had nothing to do with it. The city alleges that TT's wrong identification of him was a mistake, an accident, an inevitable unavoidable consequence of the criminal justice system which is run by human beings and human beings make mistakes. But the evidence that we have been able to identify thus far, even without discovery in this case, shows something quite different. This was misconduct. This was not an accidental, wrongful misidentification. Detective Marchman fabricated this identification. But could you explain what that as I understand it from your brief, that's based on a chain of inferences that essentially amounts to he must have, otherwise there's no reason why the victim would have made the identification if she had somehow missed Mr. Hicks's picture in the, or failed to identify Mr. Hicks from a photo among hundreds of photos in the station house. Is that basically the point? That's basically it. She passed over, I think the evidence shows that she passed over his photograph on more than one occasion. So the occasion that you're referring to is when she went down to the catch unit. Yes. And they said we want you to look at a bunch of photographs of people from the 46th precinct who are large African American men. And so there's an assumption, there is a reasonable inference that Mr. Hicks's picture would have been among those many photographs. Because he was on parole from the 46th precinct and generally met that he was black and he was within the height and the weight. So we believe the evidence shows that she did see it and passed over that photograph. We also know that Detective Marshman then showed her several other photo arrays, which of course he didn't preserve and he didn't take pictures of those arrays and he didn't keep the information. So we don't really know. But we believe that his picture might have been in those arrays as well. Might have been based on what? These are arrays that were shown before the tip? Yes. Well, if it's before the tip, why is there any reason to think that Mr. Hicks would have been one of the people in those arrays? Again, because there's a finite number of people who are going to at least generally meet the tip. Do we have any idea what that finite number might have been? We do not. We do not know. Can I get back to the array in which he was identified? Did not the victim state at the Wade hearing that Mr. Marshman said nothing to her about the people in the pictures? So what does that do to the chain of inferences that Mr. Marshman must have said to the victim something about the tip or something else that would highlight Mr. Hicks in the photo array? She was asked two questions at that Wade hearing. And at that Wade hearing. Well, but one of them was, did he say, what did he say to you? And the answer was nothing. But that short inquiry cannot finally determine these issues. Well, what I'm concerned about is in terms of the plausibility of the allegation that there was misconduct beyond what would be enough to make it a suggestive photo array. Because if that's all there was, then the Wade hearing reached the conclusion, for which Mr. Marshman is not responsible, that she had an independent recollection and, therefore, was permitted to testify to in court, but not about this suggestive photo array. Right? So there needs to be, it seems to me, something more that some greater degree of misconduct than just a suggestive photo array, because the case proceeded on the assumption there was a suggestive photo array. Right. So at that Wade hearing, the Court had decided that there was a suggestive photo array. Yes. So the Court had basically taken the array, and because he took the array off the table, it wasn't explored at that hearing. Well, why would that be? I mean, how bad the conduct was would certainly be a factor in determining whether the witness's in-court identification was tainted by the misconduct. Right? I agree with you, Your Honor. But the Court focused the inquiry at that hearing on whether or not she had an independent basis. Yes. But the Court didn't focus it. Well, but even so, isn't it relevant to that inquiry how serious the misconduct was? And whatever the Court did to focus the hearing was insufficient to prevent the question from being asked whether something suggestive was said. And the answer was that nothing was said. That's correct. The answer wasn't sort of, well, I don't think he said anything that influenced me or something equivocal. It was nothing was said. Correct. But as I said before, it's two questions. They were together for a lot of time. She was taken to the precinct by the police officers. She was in a room with other people who were also taken to the precinct by those police officers. I have no idea how long she was there. It seems kind of incredible that that was the extent of the conversation. He didn't say, look carefully. He didn't say, take your time. He said nothing. It doesn't seem to me that this inquiry has been pursued sufficiently. And at this point, where we ---- But a comment like, Mr. Hicks' own mother said that he probably did it, or some other false statement of that kind, would be kind of memorable. Would it not to ---- Would be to me. But I don't know what happened between the two of them. I know that she describes somebody who doesn't look like Mr. Hicks. Three weeks later, she identifies Mr. Hicks, a man who is 41 when she said the attacker was 25, a man who is not bald when she describes somebody who is bald, a man who does not have a pockmarked face when that's what she said this perpetrator looked like. So how did that happen? Four days after the officer receives this tip, right? And he believes Well, that's when he puts, that's when he puts Mr. Hicks' picture in a photo array. That makes sense. Four days later. That's right. He gets a tip on a Friday. Yeah. There's been no identification up until then. There's been no progress on the case. Four days after he gets the tip, he once again, and he's met with T.T. on a number of occasions. They've had a number of conversations. Isn't that what you would do? Absolutely. Okay. So I'm not sure what the problem is that the officer gets a tip, which we now know was completely erroneous, possibly even malicious, that Mr. Hicks was, that Mr. Hicks, not that Mr. Hicks did it, but that Mr. Hicks resembles the picture that was circulated. Exactly. And then, and then he takes that tip, puts Mr. Hicks' picture in a photo array, which we, assuming for the purposes of this, is somehow suggestive, that it somehow is not a fair photo array, presents it to T.T., and she says, that's the fellow. Well, we don't know what she says. Well, she identified him. The conclusion is, she's made an identification. So we don't know what the exchange is. Now, you're right, at the Wade, when they ask her, she says, oh, nothing. I think that the behavior, the change, the transformation in her memory between what she described and who she identified. But that's the very question that was the subject of the Wade hearing, whether there was something that happened that It should have been, but it really wasn't, because the judge focused, said, I'm going to suppress that. That's not coming in. Nobody's bringing in any of these photo arrays. It hasn't been preserved. He broke the law. We're not going to hear about it. So what we're going to really focus on here is her independent basis, because of the law. Right. But you just said, your concern, your inference, your belief is that what happened at the photo array must have affected her identification. That's right. And that's exactly what the question is that you just told me the hearing focused on. No. The hearing didn't. It should have focused on that. And that is what I'd like to focus on now. The hearing didn't focus on it. They went right to the incident. They said, oh, what was the lighting like? How did this man hold himself over you? How close was his head to you? What did you see about his head? What clothes was he wearing? How long were you with him? And did the defense raise questions about what happened in connection with the identification procedure, which the judge restricted the defense from getting into? The judge focused it on the independent basis. And if the defense attorney, your Honor, followed that lead and focused on what happened at the incident and did not inquire other than asking those two questions. Well, I would think you might stop inquiring if you've got such a definitive negative answer. You might think it's only going to get worse if I pursue those questions. And, of course, he did not have access to the officer to discuss it with him. He didn't have access to TT to discuss that with her. So I guess he decided he would focus on the area that the judge had directed him to focus on. And remember, in criminal cases, sometimes it's unusual to get to focus on the actual incident itself to see if there's an independent basis. Sometimes you don't get there. They decide, oh, there's been no suggestivity, so you're not going to ask about that. You're going to have to wait to trial and see what happens. So I think he was like, well, this is my opportunity to really learn something about this incident. I'm going to be able to use that information for trial. So I'm focusing right in on that. So I don't think those two answers should cut off our inquiry. And I'll tell you another reason why. It's not just the change in her memory that I argue was caused by the malfeasance of the officer, but we also know something about his character. I mean, he didn't preserve these arrays. That was misconduct. There was no excuse for that. I thought he moved his office. I thought that was the answer of why they weren't preserved. He said that they were put in a file and the office moved, and that's why they weren't preserved, yes. He said they were lost, not that he destroyed them. He didn't say he destroyed them. He said they were lost. But it's his responsibility not to lose important evidence in a case. Remember, in this case, there is no other evidence. T.T.'s identification of Tyrone Hicks was the only evidence in the case. There's nothing else linking him to this case. There's no forensics. There's no statements. There's nothing at all. So this is the sort of case where mistakes could easily be made, and in fact, it was made. Could you focus on a different allegation? One of the things that is suggested as police misconduct here is that someone, some police officer, told the prosecutor that Hicks had bragged that he was the Bronx rapist. What is the basis of that allegation, and what is the basis for attributing that to Detective Marchman? It was in the contemporaneous press reports. So it was in the press. So the press reported that Mr. Hicks had made statements suggesting he was the Bronx rapist. Correct. What — but I thought the issue was whether Detective Marchman said that to the prosecutor. Correct. I am, again, making an inference that because he communicated it to the world, in fact, to the press — Well, wait. Someone said that to the press, and I suppose it's a pretty good guess that it emanates from the police department somewhere. That's correct. Okay. But as far as Mr. Marchman and as far as this being communicated to the prosecutor, is there anything in the prosecutor's files indicating that the prosecutor had been told that? I haven't had access to everything that's in the prosecutor's files because, once again, we haven't gotten into the scope of the case. I'm sorry. I thought you had because there was this note for — the second threatening note was found in the prosecutor's file. That's correct. But I didn't get to sit down and see everything that was in the prosecutor's file. What happened in that situation is that we were trying to establish whether there was anything that we could test forensically. So this was before the exoneration. And I sat down with the appeals lawyer in the DA's office, and he went through the file because we were looking to see if there was any forensic material. And he said, oh, my goodness, look at this. This doesn't seem to have been part of the record. This is a note. So that was a big surprise both to him and to me. But I didn't get to sit down and look through everything that was in his file. So — And is there any theory as to why, if the police told the prosecutor that Mr. Hicks had made such a damaging admission, that this statement was not disclosed to the defense before the trial, or that this statement was not used — there was no attempt to use this alleged statement at the trial? I don't know what the prosecution thought about that statement. I don't know why they made a decision not to try to introduce it. My allegation here is that everything the police said to the prosecution influenced them in their decision to bring this case to trial. Yeah, but that's not my question. The question is, what is the basis for thinking that the police told the prosecutor this? And I guess your answer is, if the police leaked this information — if someone in the police department leaked this information to the press, then it's a reasonable inference that someone in the police department, most likely Mr. Marchman as the investigating officer, told the prosecutor that, too. Yes. I also think that the fact that they brought this case to trial when they had no other evidence confirming this identification, and they had other evidence which contradicted her identification, is something that we can take into consideration. If we think that the prosecutors would have been careful about going forward on a one-witness I.D. case — this is an attempted rape in the Bronx where someone was attacking women. So this was a serious case. He could have ended up with his lifetime spent in jail. Is there any special M.O. or relationship that would indicate that the T.T. attack was somehow part of the signature of the alleged Bronx rapist? Or is it just that there were a bunch of rapes in the Bronx in some period overlapping this crime? That is something, Your Honor, that I would very much like to find out in discovery. We know, or at least we believe — we don't even know for a fact — but we know two other people were brought down to the station house at the same person that the police thought attacked T.T. I believe that's what they thought. I don't know for sure, but I think that's what they thought. I know nothing about those crimes. I do not know whether the man that attacked those people used a similar M.O. to the perpetrator who attacked T.T. There were some significant — what should we say? There were some — But if there was not, then what would make it exculpatory that two other women did not identify — exculpatory of this crime — that two other women said — were unable to say whether anyone in the lineup had been their perpetrator? You're exactly right. But if there is a similar M.O., if all three of these attacks were committed by someone who squeezed the victim's neck and said, I'm going to have to put you to sleep, and behaved sexually in the same way to those women as he did to T.T., then we'd be pretty darn sure that one person attacked all three people, and that when those people said Tyrone was not that person, that would clearly be exculpatory as to this crime, and he didn't have that information. So that's the chain of inferences that would be necessary in order to make this identification was, in fact, Brady material. Exactly. Exactly right, Your Honor. Thank you. All right. Thank you very much. You've reserved two minutes for rebuttal. Thank you. Good morning, Your Honors. May it please the Court. My name is Ingrid Gustafson, appearing on behalf of the The conviction of an innocent person is always an injustice. Nonetheless, based on this complaint and the facts of what occurred in the trial, the district court properly dismissed the complaint. And that is because virtually all of the allegations, the factual allegations that plaintiff makes about the trial, were addressed during the trial. During the trial itself. And that the other inferences that plaintiff seeks to draw here are simply not supported by enough factual information. I would like to address each of the allegations that came up on my adversary's argument and why those do not support a reasonable inference of culpability under these circumstances. First, with respect to the catch identification, we actually have quite a bit of information in the record about that identification because it was explored at the suppression hearing. That is, Detective Marchman described all of the procedures and the trial court, as we see from the transcripts, actually entertained the possibility that the photo was there. The possibility. The unfortunate fact, though, was that no one knew for sure. Because Detective Marchman, as plaintiff pleads also in the complaint, asked another individual, not Detective Marchman himself, he was not the one who pulled the photos, to find photos of individuals who had been arrested in that precinct to generally match the description. So Detective Marchman didn't know. And that came out at the suppression hearing. The trial court nonetheless entertained the possibility that it had happened and nonetheless allowed the identifications in at trial. So all of these issues were explored. The fair trial claim seeks to avoid the subversion of the truth-seeking function of the trial process. But when the information is known, there is no subversion. Secondly, the discrepancies in the identification. Part of the fair trial claim or claims arises from evidence that was presented to the grand jury as opposed to post-indictment. Plaintiff actually does not make specific allegations in the complaint about what was before the grand jury. We actually don't know. You mean sufficiently specific? Yes. Yes, Your Honor. Within the count for malicious prosecution, there is only a general allegation, the same allegation that police engaged in suggestive identification procedures, fabricated evidence, committed all of the other allegations. But we don't actually know what happened in the grand jury, which makes it very difficult for the plaintiff to plead sufficient allegations to overcome the presumption that the grand jury or the premise that the grand jury acts judicially, which is the standard. Do you agree that if there was a plausible allegation, that Detective Marchman did not merely present a suggestive photo array to the victim here, as was assumed by the trial court, but did something rather more dramatic, like advising the victim that they had a tip as to the identity of the rapist, which would suggest at a minimum that there is someone who is suspicious, that the police has independent suspicions of in this photo array, that that would undermine the idea that the Wade hearing somehow solved the problem, right? I don't, Your Honor, because the allegation about what Detective Marchman said to the victim in this case was that was what I believe is a classic allegation of improper suggestiveness, that the attention of the victim was drawn to this photo. We've received the tip that this person, you know, looks like your sketch. That is – it is improper, but – You don't think it matters how many improprieties there were? Let's ratchet it up. Suppose the allegation was that the detective said, here are six pictures. By the way, number four is somebody whose mother called and said, he looks like your guy. Would that make no difference in – to a judge in deciding whether the impropriety tainted the potential in-court identification as compared to a generic sense that something was wrong with the photo array? I think there is certainly a scale of suggestiveness, Your Honor. But the fact remains that the trial court assumed – was required to assume that this – the photo array did, in fact, draw – that the victim's attention was drawn to Hicks. But nonetheless, held an independent source hearing and determined there was, in the words of the trial court, a strong independent source here. And I believe that does sever the chain of causation. Obviously, there is a scale. I mean, you could get to a coerced identification that is known to be false or something like that. I mean, I think that would be very difficult to overcome. That's probably the equivalent of an application. But you're also suggesting that there is no evidence or no – nothing other than speculation to suggest that there was such misconduct and – such extreme misconduct, and both Detective Marchman and T.T. testified that there wasn't. Absolutely.  There was only evidence to the contrary. And the questions were asked at the weight hearing, as Your Honor addressed in my adversary's argument. The two questions were, was anything said? No. Was anything – did they tell you – did the police tell you who the people in the photos were? No. At that point, it's unclear to me what additional question counsel could have asked, because the victim has said that nothing was said. And on top of that, you're arguing that with respect to the grand jury, the indictment, the grand jury process, the allegations as to what was presented to the grand jury are insufficient. Absolutely, Your Honor. It's quite a high bar. It has to be – two conditions must be satisfied. We must have sufficient evidence to draw a reasonable inference of perjury, fraud, or bad faith conduct. And it also must be sufficient to overcome the premise that the grand jury acted judicially, that there really was probable cause for the indictment. Well, but the grand jury – I mean, there's – we're not seriously entertaining the possibility that the grand jury was never told about T.T.'s identification. I – it's – so assuming, yes, that T.T.'s identification – I mean, that was – And at the time of the grand jury proceedings, there had not been a weight hearing, so there was no reason for the grand jury to believe that the identification was suggestive. I mean, I don't think we're entertaining the possibility either that the prosecutor told the grand jury, don't pay too much attention to this because they lost the photo array and so this might get suppressed or anything like that. I mean, that's not what usually goes on in grand juries. Yes. Yes, Your Honor. I understand. Certainly, I take your point. But there is – it's highly likely that the identification was at issue before the grand jury, but there is no – there is simply insufficient factual basis in this record to reach a reasonable inference that there was fraud on the grand jury. This Court has even held – Can we rule out for sure that the grand jury wasn't told that he bragged about being the rapist and that a family member called in the tip? Do we know that didn't go to the grand jury? Plaintiff must – it's plaintiff's obligation to make factual allegations in the complaint that raise the inference of culpability beyond the speculative level. So I think that we would need that allegation. But in fact, plaintiff in the complaint and throughout these proceedings has really made the opposite argument, which was that this prosecution was based on the victim's identification. We have no allegation and no independent basis in the record to draw a conclusion that these – the alleged additional fabrications were ever used by the prosecutor on any level. In theory, presented to the grand jury, presented at a trial. And I do believe that it would be plaintiff's obligations to make those allegations. I take it that Ms. Bernhard is accurate in saying that she has never had the opportunity to review the complete prosecutor's file, right? I don't know, Your Honor. But assuming – Have you? I have not either, Your Honor. I have relied entirely on the allegations in the complaint. As far as anyone in this courtroom knows, I mean, none of us have any idea whether, for example, there is a statement in the prosecutor's file to the effect that the police or even specifically Detective Marchman told me that it was Mr. Hicks's mother. And there is no – we have no way of knowing whether the prosecutor was, in fact, told that Mr. Hicks had boasted, presumably in some way that would be inadmissible because otherwise I have no – I can't imagine why it wouldn't come up at trial, that he had committed rapes in the Bronx, right? I have no way to answer that question because I haven't seen the file. Well, I'm saying no one in this – no one in this courtroom, unless some other member of – some member of the district attorney's office happens to be sitting in the audience who has reviewed the file, none of us know, you don't know, and she doesn't know, and Mr. Hicks doesn't know whether this is all true. Mr. Hicks, over the course of the prosecution and certainly following the – following his conviction, was able to obtain quite a bit of the materials from the prosecution and a number of those are before this court. And nothing in any of those – in any of those documents would have – would indicate this. Otherwise, I believe the plaintiff would have alleged that fact. But the fact remains is that we have – He does allege that. The question is whether it's plausible. And, you know, I think the essential argument from the government is, well, it isn't. It's just speculation on her part, and she has to have evidence of it, and I'm sort of wondering how she could have any better evidence than what she has if no one is looking for it and determining whether that is inaccurate. Now, I mean, we do have standards that are supposed to prevent fishing expeditions, but it does worry me that in the case of someone who has now clearly been exonerated, that we're not talking about somebody who's trying to get a shot at undoing a years-old conviction that went through the system properly and there's no real basis for thinking anything went wrong except the person's protestations of innocence and speculation about misconduct. We're talking about certain innocence, and we're talking about at least some reason to think that someone in the police department was telling the world at least falsehoods about the status of the investigation. And, you know, we don't – there's no comprehensive review of the file such that the district attorney's office can make a flat affidavit representation saying there is nothing in here that supports anything that the plaintiff is saying. We're just to say she hasn't got enough to get into that file, so door closed, end of case, dismissed at the pleading stage. Is that not troubling? I don't think that Your Honor and I are on a different page. I take your point, but the answer is yes. It is entirely speculative. And we had – there was a trial in this case. And at this – at that – I think at that point – I mean, the real question becomes what was the evidence that was used by the prosecutor? Was false evidence used to subvert the trial process? And it simply wasn't used here. Even in this case. I take that point. I take that point, that putting aside the I think also very speculative and somewhat dubious issues about Brady violations, let's assume that Mr. Hicks had a fair trial. It seemed to me in reading our precedents that a fair trial claim, perhaps a misnomer, could be supported if the police presented to the prosecutor information that was false and that would be of a type that would be likely to influence a jury. And it almost becomes a kind of variant of malicious prosecution, that the prosecutor decides to go forward with an otherwise slim case because the prosecutor has fabricated things that would make the prosecutor think, well, we may not be able to prove it beyond a reasonable doubt in court. We have lots of other reason to think this is the guy. Let's take our shot. Do you disagree that that would state a claim? Now, maybe the damages would only be for the period of detention up to the trial or something like that, but would that not state a claim in your view? I am not aware of any decision of this Court that recognized or allowed to proceed a fair trial claim where the evidence wasn't also used in the course of the prosecution. I'm not aware of any precedent that merely passing on the evidence itself is deemed to state a fair trial claim. And I think that that sort of, I mean, free-floating, sort of standardless type of analysis in which all that the only evidence available is the way to pose the prosecutor and we ask you about, well, what are the different pieces of information? I mean, I think that that in itself is a highly sort of speculative, free-floating claim that really departs from the standards that this Court has thus far attached to this claim of materiality and causation. How about the Garnett case from last year? It was used, Your Honor. The allegedly fabricated statement in that case that the plaintiff in that case supposedly walked in and made an incriminating statement at the scene of the crime was actually testified about at trial, was testified about before the grand jury, it was testified about at the suppression hearing, and it was the only allegation. Are you saying that use before the grand jury is not enough? It's got to be use before the jury? In connection with a fair trial claim. I think that there is an argument that that is correct. In Garnett, it was used before the grand jury. And here, there actually is no allegation that this information was used before the grand jury. Every criminal defendant in the State of New York has the right to get the grand jury minutes. There's no allegation here that about what actually happened in the grand jury. And furthermore, it would have to, even if it was. What about Richiuti? There, we allowed a case, a fair trial claim to go to trial even though there never was a criminal trial because the cases were dismissed pretrial. Absolutely, Your Honor. It was still, it was undisputed in Richiuti, though, that the fabricated false confession was used in the prosecution in the sense that it actually led to the addition of higher charges, for example, and it led to a two-day detention. That is, it made the crime so much more serious that the plaintiff in that case couldn't be released on a desk appearance. But wouldn't it be similar if the evidence made, if some false evidence was given to the police at the early stage and possibly even to the grand jury that made it more likely that this particular defendant was guilty and was worth indicting? As opposed, does it have to be increasing the charges as opposed to getting a very serious charge brought at all? It has to be, as this Court has held, connected to a deprivation, the legally cognizable cause of a deprivation of liberty. And furthermore, I do ---- You're asking us to add this use before a jury element that doesn't appear in Garnett. The ---- Is that right? Garnett? No, Your Honor. In the sense that it's attached to the causation and materiality requirements. That is, you have to, there have to be sufficient allegations that we, to give rise to an inference, that this information caused a deprivation of liberty or was material to the prosecutor. And where there's no indication, and in fact the opposite indication, that the prosecutor never used it in any way, in a theory, I don't think there are sufficient facts. So in section 106 of the complaint, paragraph 106, it talks about or alleges the fabrication of evidence, and this is, I'm sorry, A27, through suggestive investigation procedures and that the defendants intentionally withheld from and misrepresented the prosecutors and the grand jury facts relating to the identification of Mr. Hicks. See that? And what I took, I took your argument to be that that, in particular, is not enough. It has to overcome the presumption, the premise that the grand jury acts judicially. That is, it must eliminate that there was sufficient evidence before the grand jury to basically eliminate the probable cause. That's true of a malicious prosecution claim, I grant you. But where have we said that in the, what's confusing, Garnett is confusing a little bit to me, because it says the elements of a denial of the right to a fair trial claim are an investigating official fabricates evidence, three, that is likely to influence jury's decision, so likely to influence a jury's decision. And finally, it's forward, that information is forwarded to prosecutors, and the plaintiff suffers a deprivation of liberty as a result. That's it. Yes, Your Honor. And I think that the way that those factors would apply applies differently in each case. Here we have no allegation that this evidence was admitted at all. And furthermore ---- You mean admitted to before the grand jury? Yes. Yes, Your Honor. Well, isn't that the natural influence from 106? I don't, I disagree, Your Honor. I don't, I don't believe so. All right. If I were to disagree with you on that, Ms. Gustafson, and say that we can infer in a way, reading this in a way in light most favorable to Mr. Hicks, we can infer that the issues relating to T.T.'s initial identification were presented to the prosecutor and that that somehow was presented in turn to the grand jury. That is the initial I.D. I think I misunderstood. I may have misunderstood Your Honor's question. My point was only about the false brag and the alleged fabrication that it was Hicks's mother that called it, and not about the identification. I think, yes, I think we can, we can, we should assume that the I.D.'s were probably before the grand jury, but this Court has actually found that there may be probable cause based on a suggestive identification. The idea that suggestiveness irrevocably taints an identification is, is, has been rejected by the Supreme Court. And the mere fact that a, an identification that was later found to be suggestive was before the grand jury does not mean that there was fraud on the grand jury. In Delamada, the ---- That doesn't seem to be what Garnett tells us. I mean, there may be issues with Garnett that I've got to grapple with, but that's not what Garnett says. I ---- And you would agree with that? The, yes, that's, that is certainly overcoming the presumption. But again, there is no inference here that there was a fabricated identification. I mean, for Garnett to apply to the grand jury, I mean, there would have to be a fabrication before the grand jury, and there was not. I would also like to ---- What I'm saying is a lot of this goes back to the basic idea that suggestive identifications unfortunately happen from time to time, and it's never been suggested that the presentation of that suggestive identification to a grand jury at a time when, of course, there is, I mean, there is no in-court identification because the suspect is not before the grand jury for the victim to look at. So inevitably it's going to be she identified or she says herself, I identified this person in a lineup or a photo array, that somehow any failure of the police to alert the prosecutor to every possible suggestive thing that later comes out at a weight hearing and leads to the suppression of that identification couldn't create a fair trial claim. In the typical garden variety case where the trial then takes place after a weight hearing that suppresses the suggestive identification but finds an independent basis to go forward. Yes, Your Honor. And I would like to flag for the Court at least that in a recent supreme court precedent, I do think that it is this type of allegation about what happens before the grand jury, I think there is an argument under recent supreme court precedent that is absorbed into the malicious prosecution claim, which Your Honor recognizes it was very similar to because the supreme court recently recognized the Fourth Amendment right to be free from malicious prosecution and stated that it was the Fourth Amendment that covered the pretrial detention and the due process clause that covered starting from trial. So there is at least, I think, some question about whether, even if there was a fabrication before the grand jury, how that would play out under current, the current landscape. But the key here is there is simply a suggested, an ID that was gained with, first gained through suggestive identification procedures is simply not the same as a fabrication and if it was. But what you're saying is this is not a fabrication. That's the answer to Garnett. That is absolutely correct, Your Honor. Thank you very much.  Ms. Bernard. Just briefly, Your Honors. First of all, regarding the grand jury minutes, you don't get the grand jury minutes at trial. You only get the grand jury minutes of the witnesses who actually testified at trial. So you're entitled to see, in this case, what T.T. said in the grand jury, but that's it. And because we haven't had discovery yet, we haven't had an opportunity to find out what was in the grand jury. We haven't had an opportunity to find out what Detective Marshman said to the prosecution. We haven't had the opportunity to depose Detective Marshman about what he did in this case. Marshman was not a trial witness? Yeah, I think he did testify. Well, if he testified at trial, then his testimony before the grand jury would have been produced, would it not? Yes, I think that's absolutely right. And I think what Ms. Gustafson was suggesting is that it may not be a routine matter of discovery, but there is such a thing in New York State, as there essentially is not in federal court, as a motion for the court to review the grand jury minutes. Absolutely. But we don't know whether that was done here or whether... No. Okay. No, we don't. And the fact of the matter is, is the evidence here does point reasonably and plausibly to the conclusion that this identification was more than mere suggestion. And there is a scale at which point suggestion crosses all the way over to fabrication. If the perpetrator is described as, you know, an older white woman with long hair, and you put me in a lineup with four other older gals who have short, dark hair, and the person picks me out, well, you can say that's suggestive. Okay? You created a lineup that points the attention to one person. But that's very different than sitting down with someone that you've worked with for three weeks' time and say, okay, we've gotten a tip. This person's own family says that he's admitted to being the Bronx rapist. I want you to look carefully at these photographs and tell me what you think, okay? Because we've got some information. That's fabrication of evidence. That would be fabrication. And then if you don't tell the prosecutor that that's what you did, and you don't tell the court that that's what you did, then there can't be any intervening actors on the part of the prosecution and the court. And we need to explore whether that is, in fact, what happened. Thank you very much.